**Electronically Filed
Intermediate Court of Appeals
30156
30-JUN-2014
10:22 AM**

NO. 30156

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING
TO POLICY NO. LL001HI0300520, Plaintiff-Appellee,
v.
STEPHEN VREEKEN, an individual, PAMELA VREEKEN, an
individual, and COUNTRYWIDE HOME LOANS, a corporation,
and DOES 1-20, Defendants-Appellees
and
STEVEN VREEKEN AND PAMELA VREEKEN,
Third-Party Plaintiffs-Appellees,
v.
HARRY WENGLER AND BISHOP INSURANCE AGENCY, INC.,
Third-Party Defendants-Appellants

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 06-1-0667)

SUMMARY DISPOSITION ORDER
(By: Nakamura, C.J., and Leonard and Reifurth, JJ.)

This case centers around two homeowners insurance
policies—the "Original Policy" and the "Second Policy"—issued by
Certain Underwriters at Lloyd's, London ("Lloyd's") Subscribing
to Policy No. LL001HI0300520, through its broker Seacoast Brokers
of Hawaii LLC ("Seacoast"), and placed by Third-Party Defendant
Harry Wengler ("Wengler"), an insurance agent associated with
Third-Party Defendant Bishop Insurance Agency, Inc. ("Bishop
Insurance") (collectively, "Bishop Defendants"), on behalf of
Third-Party Plaintiff Steven Vreeken ("Steven"), whose wife is
Third-Party Plaintiff Pamela Vreeken ("Pamela") (collectively,
"the Vreekens"). The policies purported to insure the Vreekens'

home in Hauula, Hawai'i, (the "House" or the "Property") from March 3, 2004 through March 3, 2005, and from May 9, 2005 through May 8, 2006, respectively.

The House, elevated approximately nine feet above the ground since July 2004, collapsed on May 23, 2005, during an attempted structural renovation. Because the Original Policy had lapsed on March 3, 2005, and because the application used to procure the Second Policy (the "Second Application") stated that there was no renovation work underway on the Property, and thus contained a material misrepresentation which voided the Second Policy, the Vreekens were left without insurance on the House. A lawsuit followed, and a jury found Wengler and Bishop Insurance liable for general, special, and punitive damages.

The Bishop Defendants appeal from the Final Judgment in Favor of Third-Party Plaintiffs Steven and Pamela Vreeken and Against Third-Party Defendants Harry Wengler and Bishop Insurance Agency, Inc., filed on August 6, 2009 ("Final Judgment") following a jury trial, and challenge six related orders, all entered by the Circuit Court of the First Circuit ("Circuit Court").[1] On appeal, the Bishop Defendants raise thirteen points of error ("POE") which we address below in an order that we deem conducive to addressing fundamental and related topics in order.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we affirm the Final Judgment and resolve Bishop Defendants' appeal as follows:

(1) Bishop Defendants contend that any agency relationship between Wengler and Bishop Insurance was without

---

[1] The Honorable Rom A. Trader presided over the trial and issued the Final Judgment, the Order Denying Motion for Third-Party Defendants Harry Wengler and Bishop Insurance Agency, Inc.'s Motion for Judgment as a Matter of Law [("JMOL")], Filed July 10, 2009, filed August 6, 2009 ("Order Denying Motion for JMOL"), and the Order Denying Third-Party Defendants Harry Wengler and Bishop Insurance Agency, Inc.'s Renewed Motion for Judgment as a Matter of Law and/or for New Trial and/or for Remittitur, Filed August 14, 2009, filed October 16, 2009. The Honorable Glenn J. Kim presided over the hearings from which each of the other challenged orders were issued.

foundation in the record. Therefore, they maintain that the Circuit Court erred in instructing the jury on the actual and apparent authority of an agent and on whether Wengler was an agent or an independent contractor.[2] Furthermore, they argue that the court erred in submitting questions to the jury in the special verdict as to any duty Bishop Insurance had to monitor or supervise Wengler.

The Hawaii Rules of Evidence ("HRE") provide that "[t]he court shall instruct the jury regarding the law applicable to the facts of the case[.]" Haw. R. Evid. 1102 (1993). Thus, we consider whether there were facts adduced by the Vreekens suggesting that Wengler was an agent of Bishop Insurance.

"'An agency relationship may be created through actual or apparent authority.'" *State v. Hoshijo ex rel.* White, 102 Hawai'i 307, 76 P.3d 550 (2003) ((quoting Cho *Mark Oriental Food, Ltd. v. K & K Int'l*, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992)) (other citations omitted)). "Apparent authority arises when 'the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he was purported to have.'" *Cho Mark Oriental Food*, 73 Haw. at 516, 836 P.2d at 1062. "The critical focus is not on the principal's and agent's intention to enter into an agency relationship, but on whether a *third party* relies on *the principal's* conduct based on a reasonable belief in the existence of such a relationship." *Id.* at 516-17, 836 P.2d at 1062 (emphases in original).

Accordingly, in determining whether Wengler had apparent authority as an agent with respect to the issuance and renewal of the Vreekens' policy, we consider whether the Vreekens, as a third party, relied on Bishop Insurance's conduct to reasonably conclude that an agent-principal relationship existed. *See id.* Steven testified, for instance, that he went to Bishop Insurance's office for his first meeting with Wengler. The Bishop Insurance receptionist summoned Wengler, who emerged

---

[2] Since none of the parties object on appeal to the language of the instructions, the variation from the Hawai'i Standard Civil Jury Instructions is not addressed.

from inside the Bishop Insurance office area, and Steven was directed by the receptionist to a room off to the side to discuss insurance matters with Wengler. Further, Steven testified that he made his check out to Bishop Insurance and that Wengler accepted the check. Bishop Insurance then placed the Original Policy with Lloyd's.

We conclude that, based on the evidence, the jury could reasonably find that Wengler had apparent authority to act on behalf of Bishop Insurance and that Bishop Insurance was liable to the Vreekens for Wengler's acts. Thus, the Circuit Court properly instructed the jury as to the actual and apparent authority of an agent.

Because the jury could conclude that an agent-principal relationship existed on the basis of apparent authority, we need not address whether Wengler was an independent contractor, since Wengler's status in that respect was not dispositive of Bishop Insurance's liability. A principal can be liable even for the acts of an independent contractor, if they are done with actual or *apparent* authority. *See* Restatement (Third) of Agency §§ 2.01, 2.03; *Smith v. Jenkins*, 718 F.Supp.2d 155, 165 (D. Mass. 2010) (holding that whether defendants' independent contractors had real or apparent authority to bind the defendants, as principals, was an issue for the finder of fact).

Additionally, having determined that the jury could reasonably find that Wengler acted with apparent authority, any considerations with respect to the Special Verdict form question on Bishop Insurance's alleged negligent monitoring and supervision is moot. Based on the jury instructions given at trial as to apparent authority, there was a reasonable basis for the finding that Bishop Insurance bore liability for the Vreekens' damages. Therefore, we decline to address whether the evidence demonstrated that there was a duty to monitor and supervise Wengler, or whether that duty was breached.

In sum, Bishop Defendants fail to show error in the jury's consideration of a possible principal-agency relationship between Wengler and Bishop Insurance. Therefore, the Circuit Court did not err in instructing the jury or in the questions

4

asked on the special verdict form. We address the remaining arguments and points of error from the perspective that Wengler had apparent authority to act on behalf of Bishop Insurance in his professional relationship with the Vreekens.

(2) Bishop Defendants maintain that the Circuit Court erred in failing to grant judgment as a matter of law ("JMOL") on the Vreekens' claims that Wengler and Bishop Insurance failed to procure other insurance, and failed to notify or advise them after the Original Policy lapsed. Bishop Defendants allege that no duty was owed.

In Hawai'i, however, "[a]n insurance agent owes a duty to the insured to exercise reasonable care, skill and diligence in carrying out the agent's duties in procuring insurance." *Quality Furniture, Inc. v. Hay*, 61 Haw. 89, 93, 595 P.2d 1066, 1068 (1979). Such a duty is owed to "the extent of the responsibilities that the agent had in rendering help and providing advice to the insured." *Macabio*, 87 Hawai'i at 318, 955 P.2d at 111 (quoting *Quality Furniture*, 61 Haw. at 93, 595 P.2d at 1068) (internal quotation marks and brackets omitted).

In the instant case, Steven contacted Wengler on March 23, 2005 to "find out what I could do to make sure my policy would continue to be in force." Steven testified that Wengler told him that "he would take care of it." Wengler, with the assistance of Bishop Insurance employee, Carol Young, attempted to reinstate the policy, but learned that same day that the Original Policy would not be reinstated. Neither Wengler nor Bishop Insurance ever notified the Vreekens that the Original Policy had not been reinstated before the House collapsed two months later. Wengler also concealed from the Vreekens that he had submitted the Second Application with a material misrepresentation that resulted in voiding the Second Policy.

Under these circumstances, Bishop Defendants owed Steven a duty to inform him that Wengler's attempt to reinstate the Original Policy on March 23, 2005 had failed and of Wengler's actions in seeking the Second Policy. Wengler had taken'on the responsibility of reinstating the policy, and Steven was not aware that his home would not be covered. *See* 3 Couch on

5

Insurance § 46:37, at 78 (3d ed.) ("Although, as a general rule, the agency relationship between an insurance broker and the insured terminates upon procurement of the requested insurance policy, inherent in the obligation to seek continuation of an insurance policy *is the duty to notify the applicant if the insurer declines to continue to insure the risk* so that the applicant may not be lulled into a feeling of security or be put to prejudicial delay in seeking protections elsewhere." (emphasis added)); *see also Harts v. Farmers Ins. Exch.*, 597 N.W.2d 47, 52 (Mich. 1999) ("[T]he agent assumes an additional duty by either express agreement with or promise to the insured."). Thus, Wengler and Bishop Insurance owed the Vreekens a duty.

Relatedly, Bishop Defendants contend that the court improperly instructed the jury by discussing agency relationships interchangeably, thereby confusing the jury as to what duty was owed to the Vreekens. As Bishop Defendants point out, the court did switch between instructing the jury on the duties of an insurance agent and the "agency" relationship between Wengler and Bishop Insurance. Taking the instructions as a whole, however, it would have been apparent to the jury that the relationship between an insurance agent and his customer involve considerations different from those regarding a principal-agent relationship. In the instructions discussing the role and duties of an *insurance agent*, the term "insurance agent" is used. Moreover, the instructions relating to the insurance agent-customer relationship discuss *duties*, whereas the principal-agent instructions discuss whether a relationship *existed*. Therefore, Bishop Defendants fail to show how the instructions caused confusion or led the jury into "believing some additional duty had been breached."

Bishop Defendants also challenge the instructions on the duty of an insurance agent on the basis that they were contrary to law. However, in light of our holding that Wengler and Bishop Insurance had a duty to notify Steven that the Original Policy had not been reinstated and of Wengler's actions in seeking the Second Policy, Bishop Defendants have not established how the jury instructions concerning duties were

6

prejudicial and have failed to show error.

(3) Bishop Defendants argue that they should have been granted JMOL on the Vreekens' negligence claim because the Vreekens "failed to present any evidence that [they] could have obtained insurance to cover the risk of collapse."

The Vreekens had the burden to prove that there was "[a] reasonably close causal connection between the conduct and the resulting injury[.]" *Dairy Road Partners v. Island Ins. Co.*, 92 Hawai'i 398, 419, 992 P.2d 93, 114 (2000); *see also Panion v. United States*, 385 F. Supp. 2d 1071, 1089 (D. Haw. 2005) (applying Hawai'i law to a negligence claim). For purposes of causation,

> "[t]he actor's negligent conduct is a legal cause of harm to another if (a) his or her conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his or her negligence has resulted in the harm."

*Taylor-Rice v. State*, 91 Hawai'i 60, 74, 979 P.2d 1086, 1100 (1999) (original brackets omitted) (quoting *Mitchell v. Branch*, 45 Haw. 128, 132, 363 P.2d 696, 973 (1961)).

As discussed above, Wengler and Bishop Insurance owed Steven a duty to notify him that the Original Policy had not been reinstated and of Wengler's actions in seeking the Second Policy, and failed to do so. The question then becomes whether the Vreekens presented sufficient evidence for the jury to conclude that Wengler and Bishop Insurance's failure to so notify Steven was a "substantial factor" resulting in the harm.

Case law from other jurisdictions on causation in the context of the negligent failure to procure insurance is instructive. Several jurisdictions have concluded that if negligence were established on the part of an insurance broker for failure to procure a policy, the plaintiffs had to show, in order to establish proximate cause, that they could have procured the insurance they sought. *See MacDonald v. Carpenter & Pelton, Inc.*, 31 A.D.2d 952, 953 (N.Y. App. Div. 1969); *see also Lifespan/Physicians Prof. Servs. Org. v. Combined Ins. Co. of America*, 345 F. Supp. 2d 214, 228 (D.R.I. 2004) (applying Rhode Island law); *Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.*,

739 P.2d 239, 244 (Colo. 1987); *Russell v. Reliance Ins. Co.*, 672 S.W.2d 693, 694 (Mo. Ct. App. 1984).

Several other jurisdictions, however, do not require that the plaintiffs demonstrate the availability of alternative insurance in an action for negligent failure to procure a policy, but instead, if the issue arises, shift the burden to the defendants to show the unavailability of alternate insurance. *See, e.g., Lowitt v. Pearsall Chem. Corp. of Md.*, 219 A.2d 67, 73 (Md. 1966); *Boothe v. American Assurance Co.*, 327 So.2d 477 (La. Ct. App. 1976); *Hans Coiffures Intern., Inc. v. Hejna*, 469 S.W.2d 38 (Mo. Ct. App. 1971). Maryland is one such state, and in *United Capitol Ins. Co. v. Kapiloff*, the Court of Appeals for the Fourth Circuit summarized Maryland law on this issue as follows:

> [W]hen an agent undertakes to procure insurance and fails to do so, *or when he fails to inform the principal of the nonavailability of insurance from a prospective insurer so that the principal can obtain insurance from another insurer, the agent may be liable.* See Lowitt, 219 A.2d. at 73; *Patterson Agency Inc. v. Turner*, . . . 372 A.2d 258, 262 ([Md. Ct. Spec. App.] 1977). *The burden of proving the nonavailability of insurance coverage is on the insurer or the broker, because it is an affirmative defense that is within the peculiar knowledge of those familiar with the market.* See Patterson, 372 A.2d at 261. Furthermore, a broker cannot meet its burden of showing a lack of proximate cause between its failure to properly procure insurance and the insured's lack of coverage merely by showing that the insurer which it approached would not supply the insurance in question. Testimony that a particular insurer cannot supply insurance "is a far cry from evidence demonstrating that such insurance is not elsewhere available." *Id.* at 261-62.

155 F.3d 488, 499 (4th Cir. 1998) (emphases added).

Although Hawai'i law has not yet addressed the specific question, Maryland's approach appears to be consistent with Hawai'i's law on causation. In *Knodle v. Waikiki Gateway Hotel, Inc.*, the Hawai'i Supreme Court rejected the concepts of "proximate causation" and "foreseeability", instead adopting the test articulated *supra*, that the breach at issue must be a "[s]ubstantial factor in bringing about the harm." 69 Haw. 376, 390, 742 P.2d 377, 386 (1987). To require plaintiffs to establish the availability of alternative insurance coverage in all cases involving negligent failure to procure a policy would require more than what the "substantial factor" test requires.

8

Even if a plaintiff would have been unable to obtain alternative coverage, an insurance agent's failure to notify the plaintiff that the agent was unable to obtain coverage, or that the agent had engaged in conduct resulting in the policy becoming void, could still be a "substantial factor" causing the plaintiff's damages.[3/]

Therefore, we conclude that the Vreekens were not required to demonstrate that alternative insurance was available as part of their prima facie case. Accordingly, the fact that the Vreekens did not introduce evidence that they could have procured an insurance policy does not require the entry of JMOL in favor of Bishop Defendants.

(4) Bishop Defendants argue that they were entitled to JMOL on the Vreekens' Negligent Infliction of Emotional Distress ("NIED") claim because the claim arises solely out of the damage to the Property and no evidence was presented that the Vreekens suffered serious emotional distress. The general rule in Hawai'i had been that "recovery for the NIED of one not physically injured is only allowed where there has been some physical injury *to property* or a person." *Guth v. Freeland*, 96 Hawai'i 147, 150, 28 P.3d 982, 985 (2001) (emphasis added) (quoting *Chedester v. Stecker*, 64 Haw. 464, 468, 643 P.2d 532, 535 (1982)) (internal quotation marks omitted). In 1986, the Legislature adopted Hawaii Revised Statutes ("HRS") § 663-8.9, which states:

> (a) No party shall be liable for negligent infliction of serious emotional distress or disturbance if the distress or disturbance arises solely out of damage to property or material objects.
>
> (b) This section shall not apply if the serious emotional distress or disturbance results in physical injury to or mental illness of the person who experiences the emotional distress or disturbance.

HAW. REV. STAT. § 663-8.9 (1993). As the language of the statute makes clear, HRS § 663-8.9 "abolished the claim where the underlying basis for the action was property damage. However, the claim survived where the claimant's emotional distress

---

[3/] For instance, in this case, Steven testified that if he had known that the Original Policy had not been reinstated, he "definitely wouldn't have continued on construction until [he] had the insurance."

resulted in physical injury or mental illness." *Guth*, 96 Hawai'i at 150, 28 P.3d at 985.

Here, sufficient evidence, in the form of testimony from Steven and Dr. Byron Eliashof, was presented for a jury to conclude that Steven suffered serious emotional distress and that this emotional distress resulted in mental illness — namely, clinically diagnosed depression and anxiety. *See Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 361, 944 P.2d 1279, 1304 (1997) ("Medical proof can be offered to assist in proving the 'seriousness' of the NIED claim . . . ." (quoting *Campbell v. Animal Quarantine Station*, 63 Haw. 557, 564, 632 P.2d 1066, 1071 (1981)) (internal quotation marks and brackets omitted)). Likewise, sufficient evidence, in the form of testimony from Pamela and Dr. Eliashof, was presented for a jury to conclude that Pamela suffered serious emotional distress, which caused her physical injury and mental illness — irritable bowel syndrome, depression, and anxiety. Therefore, HRS § 663-8.9 does not bar the Vreekens' claims, because the statute does not apply if the serious emotional distress or disturbance results in physical injury to or mental illness of the plaintiffs.

(5) Bishop Defendants contend that they were entitled to JMOL on the Vreekens' negligent-misrepresentation claim. The Circuit Court did not err, however, in sending the negligent misrepresentation claim to the jury on the basis of Wengler's alleged statement that he would "take care of" the Original Policy's reinstatement.

Although, generally, statements that are promissory in nature cannot support an action for negligent representation, *see Honolulu Fed. Sav. & Loan Ass'n v. Murphy*, 7 Haw. App. 196, 201-02, 753 P.2d 807, 812 (1998), there is an exception wherein "[a] promise relating to future action or conduct will be actionable . . . *if the promise was made 'without the present intent to fulfill the promise.'*" *Id.* (emphasis added) (quoting *E. Star, Inc., v. Union Bldg. Materials Corp.*, 6 Haw. App. 125, 140, 712 P.2d 1148, 1159 (1985)).

Here, there was evidence adduced from which the jury could conclude that Wengler made the statement that "I'll take

care of it" without sufficient intent that he would be able to renew the policy, despite Steven's reliance on the renewal. Wengler testified that when Steven telephoned, Wengler did not tell Steven that he would need a new policy, and did not tell Steven to make the insurance renewal payment by credit card or any other instantaneous means. Carol Young testified that she had reminded Wengler on several occasions between March 21, 2005 and March 23, 2005 that the renewal payment was due from the Vreekens. Kenneth Kanehiro, an insurance educator and risk analyst who testified during the Vreekens' case-in-chief, stated that where an agent has concerns about timeliness of a policy renewal payment it is customary practice to obtain personal delivery of the payment. Wengler, however, told Steven to mail the payment instead.

Accordingly, the jury could have found that Wengler misled Steven through his statement that "I'll take care of it[,]" because he did not at that time believe that he would be able to "take care" of the policy renewal. Bishop Defendants were therefore not entitled to a JMOL as to the negligent misrepresentation claim.

(6) Bishop Defendants argue that they were entitled to JMOL on the Vreekens' punitive-damages claim because "there was no evidence, let alone clear and convincing evidence, that Mr. Wenger and [Bishop Insurance]'s conduct was wilful, wanton, oppressive, malicious, or demonstrated a positive element of conscious wrongdoing."

The jury found Wengler liable to the Vreekens for $10,000.00 in punitive damages. Bishop Defendants contend that Wengler cannot be liable for punitive damages because Wengler had no reason to know that the House was under construction when he applied for the Second Policy. As discussed, however, Wengler's liability stems from his failure to notify Steven that his efforts to reinstate the Original Policy had failed and his concealment from Steven of his conduct that resulted in the Second Policy becoming void.

Evidence showed that Wengler had knowledge that Seacoast would not reinstate the Original Policy on March 23,

11

2005. Wengler spoke to Pamela on March 25, 2005, and when Pamela asked Wengler whether Steven should call him back, he said no. Instead of informing Pamela or Steven that the Original Policy had not been reinstated, he filled out the Second Application using the same information and the same photographs provided to him over a year before without consulting Steven. Wengler did this even though, as Steven testified, Steven had originally told him that he needed insurance to cover his planned construction.

Although it was his responsibility to get Steven's signature to submit the Second Application, Wengler admitted that he did not give Steven the application to sign. Instead, the evidence presented showed that Steven's purported signature on the Second Application was forged and that the Second Application falsely stated that there was no renovation work underway on the Property. Wengler used the refund check from Seacoast to procure the Second Policy and personally signed a check from "HW Insurance Serives [sic], Inc." to cover an additional $9.00, all without consulting with Steven. Thus, the evidence supports the jury's conclusion that Wengler acted wantonly, or with an "entire want of care which would raise the presumption of a conscious indifference to consequences[,]" or committed some willful misconduct.[4] *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 16–17, 780 P.2d 566, 575 (1989).

The jury also found Bishop Insurance liable to the Vreekens for $450,000.00 in punitive damages. Bishop Defendants argue that Bishop Insurance is entitled to JMOL on the punitive-damages claim because there was no evidence that Bishop Insurance ratified Wengler's wrongful actions.

On appeal, "[t]he trier of fact's decision to grant or deny punitive damages will be reversed only for a clear abuse of discretion." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 138, 839 P.2d 10, 37 (1992). The Hawai'i Supreme Court has further explained that "[t]he deterrent or retributive effect

---

[4] Bishop Defendants also argue that there was no evidence that Wengler acted "with the intent to harm or defraud the Vreekens." The intent to cause harm is not, however, a necessary predicate to a punitive-damages claim. *See Masaki*, 71 Haw. at 16-17, 780 P.2d at 575.

of punitive damages must be placed squarely on the shoulders of the wrongdoer." *Lauer v. Young Men's Christian Ass'n of Honolulu*, 57 Haw. 390, 402, 557 P.2d 1334, 1342 (1976). "A wrongdoer in this context includes a person superior in authority who expressly authorizes, ratifies or condones the tortious act of the employee." *Id.* The clear and convincing standard of proof applies to punitive damages. *Masaki*, 71 Haw. at 16, 780 P.2d at 575.

The two potential theories for punitive damages against Bishop Insurance are that it (1) authorized or ratified Wengler's activities, or (2) was reckless in utilizing him as an agent. Although we have concluded that there was sufficient evidence to raise a question for the jury as to whether a principal-agency relationship had been established between Bishop Insurance and Wengler based on apparent authority, we find instructive cases discussing punitive damages in the context of the employer-employee relationship. This is because the employer-employee relationship appears to provide the strongest basis for the award of punitive damages under the two potential theories. However, even if we were to assume for purposes of our analysis that Bishop Insurance and Wengler were in an employer-employee relationship, there would still be insufficient evidence to support an award of punitive damages against Bishop Insurance.

In this case, the Vreekens did not present evidence that Bishop Insurance authorized or ratified Wengler's activities. Liability under a ratification theory requires that "the act complained of be done on behalf of or under the authority of the employer, and there must be clear evidence of the employer's approval of the wrongful conduct." *Sharples v. State*, 71 Haw. 404, 406, 793 P.2d 175, 177 (1990) (citing *Costa v. Able Distributors, Inc.*, 3 Haw. App. 486, 490, 653 P.2d 101 105 (1982)). Here, there was nothing to indicate that Bishop Insurance knew of Wengler's alleged promise to "take care of" the reinstatement. The evidence also does not show that Bishop Insurance had the requisite knowledge to authorize or ratify Wengler's conduct vis-a-vis the Second Application. *See id.; cf. Jarvis v. Modern Woodmen of America*, 406 S.E.2d 736, 743 (W.Va.

1991) (awarding punitive damages against insurance company for the actions of its agent where the company knew of the wrongful actions of the agent, continued to employ him and took no further investigation into his sales practices).

The RESTATEMENT (SECOND) OF TORTS § 909 (1979) provides that a principal can be held liable for punitive damages if "the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him[.]" Although we did not need to address the inclusion of the question regarding Bishop Insurance's monitoring or supervision of Wengler on the Special Verdict Form, we address the issue here to the extent that it would provide a separate basis for *punitive* damages.

An award of punitive damages is appropriate "where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Masaki*, 71 Haw. at 17, 780 P.2d at 575; *Ditto v. McCurdy*, 86 Hawaiʻi 84, 91-92, 947 P.2d 952, 959-60 (1997); *see also* 2 PUNITIVE DAMAGES: LAW AND PRAC. 2d § 24.4 (2013 ed.) ("The agent is liable because of the agent's own vicious act and the principal because of recklessness in exposing others to that viciousness."). The evidence presented at trial does not support an award of punitive damages on this alternative theory either.

The only evidence adduced suggesting that Bishop Insurance was negligent in utilizing Wengler's services was Rosen's testimony that he knew that Wengler had been denied a discharge in bankruptcy. This alone is not enough to award punitive damages against Bishop Insurance.

Other jurisdictions require more egregious conduct in order to assess punitive damages against an employer based on the employer's hiring or retaining an employee. *See, e.g., Boyd v. L.G. DeWitt Trucking Co.*, 405 S.E.2d 914, 920 (N.C. Ct. App. 1991) (trucking company could be liable for punitive damages where employee driver had violations in prior three years for failing to stop for a siren, reckless driving, speeding, and driving while intoxicated); *Bryant v. Livigni*, 619 N.E.2d 550, 558 (Ill. App. Ct. 1993) (punitive damages permitted where employer knew that employee had previously attacked a fellow

14

employee and been convicted of aggravated battery, then later attacked a child resulting in the child's hospitalization). Thus, in order to assess punitive damages against an employer for hiring or retaining, a showing beyond simple negligence is required. Here, however, the Vreekens did not adduce or refer us to any evidence suggesting that Bishop Insurance's actions were wilful or indicated an entire want of care raising a presumption of conscious indifference on the part of Bishop Insurance with respect to utilizing Wengler's services. *See Ditto*, 86 Hawai'i at 91-92, 947 P.2d at 959-60.

Accordingly, the evidence presented at trial does not support an award of punitive damages against Bishop Insurance under a ratification theory or because Bishop Insurance was grossly negligent in utilizing Wengler's services. We therefore vacate the award of punitive damages against Bishop Insurance.

(7) Bishop Defendants contest the amount of the punitive damages awarded against Wengler, alleging that "the [C]ircuit [C]ourt should properly have remitted the $10,000 punitive award as excessive in light of [Wengler's] insolvency as requested by the [renewed motion for JMOL]." Prior to trial, Bishop Defendants filed a motion in limine asking the Circuit Court to exclude any reference to Wengler's 2009 bankruptcy filing as irrelevant and unduly prejudicial.[5] The Circuit Court granted the motion. Thus, *because of Bishop Defendants' own request* to exclude the evidence, the jury was unaware of Wengler's financial status at the time of trial. Furthermore, Bishop Defendants pointed toward no evidence of Wengler's financial status at the time of trial in their request to reduce the damages award included in their renewed motion for JMOL. Therefore, Bishop Defendants' argument as to the reduction of Wengler's punitive damages is without merit.[6]

---

[5] As will be discussed *infra*, the Circuit Court allowed evidence that an earlier bankruptcy filing by Wengler had been dismissed to come in at trial.

[6] Bishop Defendants also argue that the award of punitive damages against Bishop Insurance was excessive. However, in light of our holding that punitive damages should not have been awarded against Bishop Insurance, we do not address this argument.

(8) Bishop Defendants argue that the Circuit Court erred in admitting evidence related to Wengler's prior, unrelated bankruptcy case. Specifically, Bishop Defendants contest the court's decision to allow the Vreekens to question Wengler about the dismissal of a bankruptcy petition for failure to provide complete and truthful information about his financial affairs and about a judgment entered by a bankruptcy court which found that Wengler had incurred debts through false pretenses, false misrepresentations, and/or actual fraud.

Bishop Defendants argue that such evidence was irrelevant or, in the alternative, that the probative value of such evidence was substantially outweighed by the prejudicial effect on the jury. According to Bishop Defendants, the "mere allegations in a bankruptcy and/or civil action" did not serve to prove or disprove any disputed fact at trial.

Bishop Defendants argue that the dismissal of Wengler's bankruptcy proceedings was because he provided "incomplete information", which they claim does not amount to an instance of untruthfulness. However, at trial, Wengler was asked: "And you remember in . . . February 21, 2007 your bankruptcy was dismissed because you failed to provide complete and truthful information; correct?". Wengler responded, "[t]hat's true, yes." In the context of bankruptcy, failing to provide complete information could clearly amount to a misrepresentation that would have bearing on truthfulness.

The Circuit Court admitted evidence regarding the bankruptcy matter "as bearing upon Mr. Wengler's character for truthfulness[.]" The Vreekens argue that the evidence was properly admitted under HRE Rule 608. Pursuant to HRE Rule 608, "[s]pecific instances of the conduct of a witness, for the purpose of attacking the witness' credibility, *if probative of untruthfulness*, may be inquired into on cross-examination of the witness and, in the discretion of the court, may be proved by extrinsic evidence." Haw. R. Evid. 608(b) (1993) (emphasis added).

The cases cited by Bishop Defendants in support of its position are distinguishable. *See Colburn v. Spitz*, 11 Haw. 104,

104-05 (Haw. Rep. 1897) (old rule that "particular acts of misconduct cannot be proved for the purpose of impeaching the general credibility of a witness" plainly contradicted by HRE Rule 608(b) with respect to untruthfulness); *Harsco Corp. v. Renner*, 475 F.3d 1179, 1190-91 (10th Cir. 2007) (affirming district court's discretionary exclusion of evidence to avoid a mini-trial where the plaintiff had already conceded that she had signed forms without verifying their accuracy); *United States v. Hawley*, 562 F. Supp. 2d 1017, 1047-48 (N.D. Iowa 2008) (analysis does not consider Federal Rules of Evidence Rule 608).

The evidence that Wengler had a bankruptcy petition dismissed due to his failure to provide "complete and truthful information" and that a bankruptcy court had found that he had incurred debts through false pretenses, misrepresentations, or fraud is probative of Wengler's character for untruthfulness.[7] Evidence is typically deemed relevant under HRE Rule 608 when it "involves fraudulent representations made to obtain money or other advantage to which the falsifier was not entitled." A. Bowman, *Hawaii Rules of Evidence Manual* §§ 608-2[1][A] (3d ed. 2006). The evidence here fits that description. *See also United States v. Jensen*, 41 F.3d 946, 957 (5th Cir. 1994) (evidence of false statements made on a bankruptcy document probative of defendant's character for untruthfulness). Thus, the evidence was both relevant and probative.[8]

Moreover, the probative value of the evidence was not outweighed by the danger of unfair prejudice. Haw. R. Evid. 403. The Circuit Court gave a limiting instruction with respect to the evidence. Specifically, before the contested testimony was heard, the Circuit Court instructed the jury: "While you may

---

[7] While trying to characterize the contested evidence as the result of Wengler's poor knowledge of bankruptcy procedure, Bishop Defendants cite only to their motion in limine no. 5 and the supporting memorandum. In those documents, Bishop Defendants' attorney simply characterizes the import of the evidence without citation. The argument of counsel is not evidence and does not advance the appellants' cause. *See Leis Family Ltd. P'ship v. Silversword Eng'g*, 126 Hawai'i 532, 534 n.2, 273 P.3d 1218, 1220 n.2 (App. 2012).

[8] Bishop Defendants do not challenge the admission of the contested evidence on the basis that it was inquired into on direct-examination, and we do not consider this issue.

consider this evidence as bearing upon Mr. Wengler's character for truthfulness, you may not consider this evidence for any other purpose." A jury is presumed to follow a trial court's instructions. *State v. Cordeiro*, 99 Hawai'i 390, 413, 56 P.3d 692, 715 (2002). On balance, even if there was some prejudice associated with the introduction of the evidence, Bishop Defendants have not established that the prejudice outweighs the probative value of the evidence. Therefore, the Circuit Court did not abuse its discretion in admitting it.

(9) Bishop Defendants contend that the Circuit Court erred in admitting evidence that the signature on the Second Application was forged. Specifically, they argue that certified handwriting and document examiner Reed Hayes's expert testimony that the signature on the Second Application was not Steven's was either irrelevant or had probative value which was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. They further argue that the Vreekens' contention that Wengler was the forger was without any basis.

Under HRE Rule 401, relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Haw. R. Evid. 401. Contrary to Bishop Defendants' contention, evidence that Steven did not sign the insurance application supported the reasonable inference that Wengler had forged Steven's signature on the Second Application. Wengler personally signed a check from "HW Insurance Serives [sic], Inc." to pay for the extra costs for the Second Policy rather than contacting Steven. Furthermore, Wengler admitted that it was his responsibility to get Steven's signature, but that he did not believe that he ever gave it to Steven to sign.

No evidence was offered that the insurance application was ever out of the possession of Wengler or Bishop Insurance. Thus, the evidence that Steven's signature was forged on a document under the control of Wengler or Bishop Insurance was circumstantial evidence that Wengler had forged the signature and

was relevant to the Vreeken's negligence claims, and to the issue of punitive damages. Although evidence of the forgery may have had some prejudicial effect, its probative value was not outweighed by the danger of unfair prejudice. *See* Haw. R. Evid. 403 (1993). Bishop Defendants have not shown that the Circuit Court abused its discretion in its application of HRE Rule 403.

(10) Bishop Defendants argue that the Circuit Court erred in excluding evidence concerning the details of the House collapse because "[e]vidence of the series of mistakes and negligent actions taken" by Steven is relevant to Steven's credibility and the question of whether one of the insurance policies would have covered the collapse. Bishop Defendants present no argument on the question of how this evidence impeaches Steven's credibility; thus, the first argument is waived. Haw. R. App. P. 28(b)(7).

As to the second argument, Bishop Defendants appear to allege that it was necessary for the specific facts surrounding the House collapse to be introduced into evidence at trial for Bishop Defendants to refute the causation element of the Vreekens' negligence action, and thus the evidence was erroneously excluded.

Bishop Defendants argue that the cause of the collapse was relevant to causation — specifically, whether the loss would have been covered under the Original Policy. However, the Original Policy had not been renewed and evidence related to the collapse would have created a coverage dispute within the trial that would have been confusing to the jury. Moreover, the negligence at issue was the failure to notify the Vreekens that they had no insurance coverage due to Wengler's actions, thereby depriving the Vreekens of the opportunity to secure alternate insurance protection. Evidence concerning the cause of the collapse would not have addressed whether the Vreekens suffered harm as the result of such negligence. Steven, in fact, testified that he would have stopped construction if he had known that he did not have insurance. Thus, Bishop Defendants have not shown error.

(11) Bishop Defendants failed to present any argument in support of their point of error that the Circuit Court erred in entering judgment or granting remittitur of the jury's general damages award because HRS § 663-8.9 "limits the award of general damages for claims arising exclusively from injury to property." This point appears to substantively duplicate the fourth point of error, which relates to the NIED claims. To the extent that this is a separate point of error, it is waived. Haw. R. App. P. 28(b)(7).

(12) Bishop Defendants contend that the Circuit Court erred in admitting evidence of the Vreekens' legal fees incurred in litigation with Lloyd's, and in failing to grant judgment or remittitur to Wengler or Bishop Insurance "in light of the substantial comparative negligence of the Vreekens and the affirmative waiver of fees and costs by all parties in the Lloyd's Final Judgment." The point of error, however, fails to comply with HRAP Rule 28(b)(4), which requires that each point of error shall state "where in the record the alleged error occurred; and . . . where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency." Haw. R. App. P. 28(b)(4). In addition, to the extent that Bishop Defendants contend that the Circuit Court erroneously admitted evidence, the point of error must include "a quotation of the grounds urged for the objection and the full substance of the evidence admitted or rejected[.]" Haw. R. App. P. 28(b)(4)(A).

Even if we were to address the merits of the point, Bishop Defendants' substantive arguments are insufficiently argued and therefore fail. First, Bishop Defendants argue that while *Uyemura v. Wick*, 57 Haw. 102, 551 P.2d 171 (1976), provides that a plaintiff can recover attorneys' fees from a defendant for attorneys' fees expended defending against a third-party's claim if the expenses were incurred as a result of the defendants' wrongful conduct, "this limited exception is not applicable in this case where the jury found the Vreekens 40% comparatively negligent. *Uyemura*, 57 Haw. at 108, 551 P.2d at 176." Bishop Defendants' conclusion, however, is not directly supported by

*Uyemura*, as that case does not address the issue of comparative negligence. *See State v. Vinuya*, 96 Hawai'i 472, 486, 32 P.3d 116, 130 (App. 2001) (conclusory contentions do not constitute arguments).

Second, Bishop Defendants contend that an award of fees and costs was inappropriate in light of the court's order in the underlying Lloyd's litigation, holding that "each party shall bear its or their attorneys'. fees and costs." Bishop Defendants did not provide any further analysis, failing to argue, for instance, why the language in the Lloyd's Judgment should be dispositive where, subsequent to the entry of that judgment, a jury found Bishop Defendants liable for a variety of torts. Bishop Defendants' arguments are not only insufficient for proper appellate review, they are unpersuasive.

(13) In brief argument that cites two out-of-state cases, Bishop Defendants contend that a negligent insurance agent's liability for special damages, in an action for negligent failure to procure a policy, should be capped at the amount that the insured would have been entitled to under the policy. Although the basic legal proposition is potentially of some merit, Bishop Defendants fail to allege to what extent the "special damages" award should be reduced in this case. This is particularly problematic since, contrary to Bishop Defendants' allegation, the jury's award of $352,757.68 in special damages was not only "for coverage under the policy", but also included special damages related to the negligent misrepresentation claim.[9/] Thus, we decline to address the point of error.

Therefore, IT IS HEREBY ORDERED that the Final Judgment in Favor of Third-Party Plaintiffs Steven and Pamela Vreeken and Against Third-Party Defendants Harry Wengler and Bishop Insurance

---

[9/] The special verdict form did not differentiate between special damages for negligence and special damages for negligent misrepresentation. Moreover, the jury instruction as to special damages instructed the jury to consider, *inter alia*, "[t]he insurance coverage [the Vreekens] should have received, lost business income, [and] rental expenses[.]" Thus, even though Bishop Defendants allege some dollar amounts with respect to the policy for the first time in their reply brief, they do not address how the special damages for negligence should be distinguished from special damages for negligent misrepresentation.

NOT FOR PUBLICATION IN WEST'S HAWAII REPORTS OR THE PACIFIC REPORTER

Agency, Inc., filed on August 6, 2009 is reversed as to the award of punitive damages against Bishop Insurance and affirmed in all other respects.

DATED:  Honolulu, Hawai'i, June 30, 2014.

On the briefs:

James H. Hershey and
Kathleen M. Douglas
(Fukunaga Matayoshi Hershey
Chung & Kop LLP)
for Third-Party Defendants-
Appellants.

Kevin W. Herring,
Paul S. Aoki,
Connie C. Chow, and
Gary P. Quiming
(Ashford & Wriston)
for Defendants-Appellees/
Third-Party Plaintiffs-
Appellees.

Chief Judge

Associate Judge

Associate Judge